St. John, surv. *vs.* O'Connel, surv. for the use, &c.

ST. JOHN, surv. *vs.* O'CONNEL, surv. for the use, &c.

1. No objection can be taken, in point of law, to a declaration in trover, against joint traders, for the wrongful conversion of notes or other property : and the joint effects of the copartnership, are jointly chargeable with the reparation of the injury.

2. Generally, a defendant, in trover, will not be permitted to give in evidence the answer, made by him, to a demand of the plaintiff, of the chattel, the subject of suit.

3. Such evidence, though it might be legal *in itself*, would not be generally admissible, upon the rule, that a party may not give in evidence, in his own favor, his own declarations.

4. Though it would seem, this rule would have exceptions :— as, where, in trover—upon a demand, by an agent, the party insists upon the production of the agent's authority, and declines a delivery, because the authority is not shewn ;—there, such refusal would not amount to a conversion : and evidence of the excuse for the non-compliance with the demand, though coming from the defendant, wou'd be admissible. *Secus,*— if the defendant asserted a title to the chattel.

5. In such case, by informing the court of the nature and purport of the defendant's rep y, if proper testimony, it will be allowed by the court.

6. Questions of practice, upon the maxim, *stare decisis*, will be rarely disturbed by the court.

7. Records of proceedings in courts of judicature, are only admissible as evidence between parties and privies, and the principle which excludes judgmeı ts *in er alios*, excludes also executions, and the returns upon them.

8. An illegal assumption of ownership, an illegal using or misusing, or a wrongful detention of a personal chattel, will amount to a conversion, in trover.

St. John, surv. *vs.* O'Connel, surv. for the use, &c.

9. And, a temporary conversion will render a defendant liable; for a conversion which has once taken place, cannot be cured.

10. Though a re-delivery, after a conversion, might go in mitigation of damages: Thus—

11. Where one puts notes in the hands of another, to indemnify him against certain liabilities—when those liabilities are discharged, the party depositing the notes has a right to claim their return, or the proceeds of the notes, if collected.

12. Where one puts notes in the hands of another, as collateral security, for a specific purpose, and the bailee puts it beyond his power to return the notes, when the purposes for which they were pledged are satisfied—he is justly chargeable for their conversion; and,

13. The amount expressed upon the face of the notes, with interest from their maturity, up to the time of the conversion, and then interest on the aggregate from that time to the verdict, is the measure of damages.

14. The existence of a former debt, due the pledgee, does not authorise him to detain the pledge for that debt, when it has been put into his hands for another purpose : unless there is a just presumption, that such was the intention of the parties.

Error to the Circuit court of Mobile.

This was an action of *trover*, against the plaintiff in error, tried before *Chapman*, J. in the Circuit court of Mobile. The declaration averred the conversion of two promissory notes. To this the defendant demurred ; and his demurrer being overruled, the case went to the jury upon the general issue, when a verdict was returned for the defendant in error, to the amount of the notes, charged to have been converted, with interest.

On the trial, a bill of exceptions was sealed up by the Judge, upon the application of the plaintiff in error.—From which it appeared, that on the fourteenth of July,.

St. John, surv. *vs.* O'Connel, surv. for the use, &c.

eighteen hundred and thirty-two, the plaintiff, and his *then partner*, with a view to their indemnity against the consequences of the indorsement of a large amount of paper of the defendant, and his *then partner*, to mature in January and February thereafter, received from them a transfer of negroes and other property. After describing the property transferred, and the paper indorsed, the instrument proceeded, "If the above described paper be paid at maturity by the acceptors and drawers, and by Messrs. O'Connel & Brenan, the above mentioned collateral security is to be given up—otherwise, to be considered as our property from this date, according to the tenor of the transfers, and to be used by us as such, for our benefit. As an additional security for these indorsements, Messrs, O'Connel & Brenan are to transfer to us. notes and acceptances of country names of unquestionable responsibility, to the amount of ten thousand dollars, payable at any time within the period of February next ensuing."

On the ninth of August, eighteen hundred and thirty-two, as shewn by a receipt of the agent of Messrs. St. John & Leavens, Messrs. O'Connel & Brenan transferred to them a note made by F. & C. McLemore, on the thirteenth December, eighteen hundred and thirty-one, for the payment of two thousand one hundred and thirty-two dollars and seventy-two cents, to B. Gordon & Co. or bearer, on the first day of January next thereafter, and another note made by Curry, Jackson & Co. on the twentieth March, eighteen hundred and thirty-two, for the payment of nine · hundred and fifty-nine dollars and ninety-five cents, to B. Gordon or bearer, on the first day

of January, one thousand eight hundred and thirty-three.

It was in proof, that the paper of Messrs. O'Connel & Brenan, was met by them at maturity, and was advanced on by Messrs. St. John & Leavens, who were fully refunded their advances, interest and commissions, by the former, in August, eighteen hundred and thirty-three.

It was also shewn, that the agent of O'Connel & Brenan demanded of St. John & Leavens, the notes of the Messrs. McLemores, and of Curry, Jackson & Co., which they refused to deliver up. On the cross-examination of this witness, who was introduced by the defendant in error, he was asked what answer St. John & Leavens made to the demand of the notes ; but that question was objected to by the party introducing the witness, and the objection sustained by the court ; whereupon, the plaintiff excepted, &c.

Testimony was also given to the jury, tending to shew that the Messrs. McLemores were solvent in eighteen hundred and thirty-three, and so continued up to the time of this trial, though they may have been insolvent in eighteen hundred and thirty-two.

A witness deposed that he was acquainted with Curry & Jackson, whom he supposed to compose, in part, the firm of Curry, Jackson & Co. and though he did not know particularly the extent of their resources, he considered them solvent, and would, at any time since his acquaintance, have credited them.

No evidence was given, of the consideration of the notes in controversy.

The plaintiff in error then proposed to offer to the jury, records of two suits and recoveries of judgments, in the

District Court of the United States, for the Southern District of Alabama, in the name of J. D. Beers & Co.—the one against F. & C. McLemore, and the other against Curry, Jackson & Co. These transcripts were offered to show that the notes now in controversy had been sued on, and were now in the custody of the law, and were merged in judgments at the time of their demand by the agent of the defendant ; and also to show, that *fieri facias'* had issued on the judgments, and been returned by the marshal, *nulla bona*. The court rejected the transcripts, as containing records of suits between other parties.

It was further shown by the plaintiff, that they had not transferred, for value, the notes in question, to J. D. Beers & Co.—that that house having an interest in the business of St. John & Leavens, suits were caused to be brought in their names, as citizens of another State, in order to a speedy collection through the agency of the District court. It was stated by a witness for the plaintiff, that J. D. Beers & Co. being partners of St. John & Leavens, the latter assumed to control the judgments in their names, and that the collection, when made, was for the benefit of St. John & Leavens—that it was true St. John & Leavens had no letter of attorney under seal, but claimed the authority to conduct the business " by virtue of the co partnership."

The plaintiff also proposed to show, that at the time of the demand of the notes in controversy, St. John & Leavens were the holders of, and jointly interested in, a bill drawn on the nineteenth day of June, eighteen hundred and thirty-two, by B. Gordon & Co., on O'Connel

& Brenan, and accepted by the latter, for thirty-eight hundred and sixty-four 29 100 dollars, at nine months date. This bill was still in their hands, ready to be produced—and that the other parties to it were all insolvent—all which was rejected by the court; whereupon, the plaintiff excepted, &c.

The plaintiff further proved, that St. John & Leavens had expended several hundred dollars in costs, &c. in attempting to collect the notes in dispute, yet there was no proof that they even demanded these expenditures of O'Connel & Brenan, or gave to them or their agent any notice of the claim at the time, before, or since they were refunded their advances.

The court instructed the jury,—if they believed that O'Connel & Brenan had fully re-paid to St. John & Leavens, the principal, interest and commissions advanced by them on the papers which were intended to be secured by the notes in controversy, that they were entitled to a return of these notes. That the plaintiff could not retain for any other debt—and that the reimbursement of St. John & Leavens, their advances, &c. placed the defendant in the same situation he would have occupied, had O'Connel & Brenan paid their liabilities with promptness, and saved the necessity of any advance for their benefit. That a previous transfer of the notes, and the fact that they had been put in suit, did not excuse their delivery to the defendant or his agent.

The defendant requested the court to instruct the jury, "that if they believed the acceptances were not paid at maturity, that according to the contract, the notes became the property of St. John & Leavens, and that they

could then transfer them, or sue on them, or dispose of them as their own; and that if in such case they were responsible to the plaintiffs, it could not be in trover, but must be in another form of action; and that if money was due them in August, eighteen hundred and thirty-three, from O'Connel & Brenan, which they were willing to pay unconditionally, they might receive it without compromitting their rights, and that it would not change the nature of the remedy, and that the plaintiffs could not, in such case, maintain trover"---all which was overruled. And the court further instructed the jury, "that the measure of damages, was the amount of the notes and interest," up to the time of the trial.

To all which decisions of the court, whether in instructing, or refusing to instruct the jury in the admission or rejection of evidence, the plaintiff excepted, &c.

To reverse the judgment, it was here assigned in error—

1. There was no cause of action shewn by the writ and declaration of plaintiff below, inasmuch as trover cannot be maintained by one for the use of another.

2. The court erred in overruling the demurrer of the defendant below, and should have sustained said demurrer, and given judgment for the defendant thereon.

3. The court erred in the several decisions made; in the admission and rejection of evidence; and in giving the instructions, and in declining to give the instructions asked for by the defendants below.

*Thornton,* for the plaintiff in error.
*Campbell,* contra.

St. John, surv. *vs.* O'Connel, surv. for the use, &c.

COLLIER, C. J.—The arguments at the bar have presented these points:

*First*—As to the sufficiency of the declaration.

*Second*—The propriety of the refusal by the court, to permit the plaintiff to ask the defendant's witness, what answer St. John & Leavens made to the demand by witness, of the notes in dispute.

*Third*—Was the transcripts from the District court, evidence to show an excuse for the non-delivery of the notes by St. John & Leavens, or to prove the insolvency of the makers, by the marshal's return of *nulla bona*?

*Fourth*—Were O'Connel & Brenan entitled to a return of the notes of F. & C. McLemore, and Curry, Jackson & Co., upon the re-payment by them to St. John & Leavens, of the advances upon the paper, these notes were pledged to secure?

*Fifth*—Did the fact of having put the notes in suit in the names of J. D. Beers & Co., amount to a conversion —if so, what should have been the measure of the defendant's damages?

*Sixth*—Could St. John & Leavens retain the notes to satisfy any other demand, they might have against O'Connel & Brenan?

*First*—We do not discover any available objection to the declaration, in charging St. John & Leavens, as partners. To authorise a recovery, it is only necessary to show that the conversion complained of, was a transaction in the course of the partnership dealings, or in the conduct of the affairs of the concern. Suppose property be placed in the hands of warehouse-men or factors (who are co-partners) for a particular purpose, and instead of

7 P. 60

giving it its appointed destination, they wrongfully detain it, or illegally assume an ownership,—are not the joint effects justly chargeable with the reparation of the injury sustained by the owner? And how are these effects to be reached, where there are other partnership creditors, unless a recovery shall be had against them, as joint traders or dealers? The declaration is certainly unobjectionable in point of law—the right to recover on it, must depend upon the proof.

*Second*—The precise question embraced by the second point, was made in Dent & Cade vs. Chiles' adm'r—(5 Stew. & Por. 383.) In that case, the plaintiffs in error, who were defendants in the court below, were sued in trover, for the alleged conversion of slaves. On the trial, the plaintiff introduced a witness, who proved a demand by him, of the slaves of the defendants, previous to the commencement of the suit; whereupon the defendants offered to prove by the same witness, the reply which they made to the demand. But this was refused by the court, on the ground, that to permit the defendants declarations at the time of the demand, would be to enable them to make evidence for themselves.

The plaintiff further proved, that at the time the demand was made, the defendants omitted to deliver the property sued for—whereupon, the defendants proposed to prove by the same witness, the reasons stated by them for their failure to comply with the demand—but this was also denied, for the same reason that caused their first proposition to be refused. This court affirmed the judgment of the inferior court,—considering that though the evidence sought to be elicited might be legal *in itself*,

St. John, surv. *vs.* O'Connel, surv. for the use, &c.

yet the question was not properly framed.   It is stated, as a general rule, that " a party is not authorised to give his own declarations in evidence, in his own favor,"— though it is not denied that this rule has its exceptions· If, upon a demand of property by an agent, the party in- sists upon the production of the agents authority, and declines a delivery, · because of its non-production, here there would be no evidence of a conversion, and the ex- cuse for a compliance with the demand, though it come from the defendant himself, would be admissible to show that no wrong was imputable to him.   But if instead of offering an excuse for yielding to the demand, the defen- dant had asserted a title, spoken of its origin, &c. his re- sponse would not be evidence.   A mere demand of pro- perty, which is a duty imposed by the law upon a par- ty, to entitle himself to an action of *trover*, against one whose possession is rightful, could not, with propriety, draw forth such an answer.   If the law were other wise, most defendants would be careful at the time of a demand, instead of offering an apology for their con- duct, to furnish evidence of their title,—and plaintiffs be often prejudiced by the performance of what is, in ma- ny cases, an indispensable pre-requisite to the prosecu- tion of their rights.

In the case cited, the court say, " If the reply was such as made it an exception to this rule, and amounted to a reasonable qualification of the refusal, the party wishing the advantage of such an exception, should have shown it.   By informing the court what the nature and purport of that reply was, if proper testimony, the court would have been bound to allow it to go to the

St. John, surv. *vs.* O'Connel, surv. for the use, &c.

jury. It is the court's province to guard the jury from the reception of illegal testimony, lest it should have an influence, notwithstanding it may be afterwards withdrawn from them: and the practice is to take the opinion of the court on the admissibility of testimony, any ways doubtful, before offering it to the jury. If improperly rejected by the court, the party injured has his remedy in the revising court."

In the case at bar, the court was not informed of the facts expected or desired to be proved by the witness, and the question framed accordingly ; but a mere general question proposed, to which the answer might have disclosed either legal or illegal testimony, depending upon the character of the reply to the demand of the notes. The case cited is direct to the point, both in its facts as well as principles, and as it settles a question of practice, even were we dissatisfied with it, we should yield sufficient homage to the maxim of *stare decisis*, as to accord to it its full influence.

*Third*—The records of the suits, judgments and executions, by J. D. Beers & Co. vs. F. & C. McLemore, and J. D. Beers & Co. vs. Curry, Jackson & Co. were properly rejected. It is an established general rule, that records of the proceedings in courts of judicature, are only admissible as evidence between parties and privies. In Chapman vs. Chapman, (1 Munf. R. 398,) it was determined, that the record of one suit cannot be used as evidence in another, on the ground, that the defendant and one of the plaintiffs in the latter suit, were parties to the former, and that the same point was in controversy in both —another plaintiff, and the person under whom both

plaintiffs jointly claimed, not having been parties to the former—(See further as to this point, Bond vs. Ward, 1 Nott & McC. R. 201; Carmack vs. Commonwealth, 5 Binney's R. 184; Duval et al. vs. Green, 4 Har. & J. 270; Harwood vs. Rawling's heirs, Ibid, 126: So in Burgess vs. Lane, et al. 3 Greenl. R. 165;)—it was adjudged that a verdict and judgment are not admissible evidence to show a co-partnership, even where that fact was expressly put in issue by the pleadings, where the action in which such evidence is offered is not between *both* the parties to the former suit. But it is needless to multiply authority to this point, for it rests upon a cardinal principle of natural justice, which maintains that no man shall be bound by an act or admission of another, to which he was a stranger. A different rule would often be promotive of the severest injustice, by making a party responsible for a result, against which he could have made no defence; from which he could not appeal, and which may have been superinduced by the negligence of another, or else by fraud or collusion. This reasoning will apply with all force to the return by the marshal of *nulla bona*, to the executions, (even conceding such a return to furnish any evidence of insolvency.) It is competent for the plaintiff in execution to gainsay, by motion, the truth of that return, and upon an issue being made up, to submit to a jury, the ascertainment of its falsity; and if untrue, to fix a personal liability upon the officer returning the execution—A stranger is not entitled to such a proceeding, and though the return be unauthorised in fact, he cannot question it. By analogy to the principle which excludes judgments *inter alios*, the executions and their returns are alike inadmissible.

*Fourth*—St. John & Leavens received of O'Connel & Brenan the notes in controversy, to indemnify them against the consequences which might result from their endorsements of the paper of the latter; and though there may have been no express stipulation to return the notes, yet the law tacitly annexed an undertaking to the contract of the parties, that so soon as O'Connel & Brenan relieved St. John & Leavens from their liability, or refunded to them all advances, with interest,&c.—that then the latter would re-deliver to the former these notes, unless they had sooner collected them; and that if a collection should be made, that St. John & Leavens would account for the proceeds. The stipulation in the contract, by which it is agreed, that if the paper of O'Connel & Brenan should not be paid at maturity "by the accepters and drawers, or by Messrs. O'Connel & Brenan," that the collateral security given at the time of the contract, was to be considered as the property of St. John & Leavens, from the date of the contract, "according to the tenor of the transfers," and be used by them as such for their benefit,—does not extend to the notes in controversy. These notes were received afterwards, under this provision in the contract: "As an additional security for these endorsements, Messrs. O'Connel & Brenan are to transfer to us notes and acceptances of country names of unquestionable responsibility, to the amount of ten thousand dollars, payable at any time within the period of February next ensuing." Now, there is certainly not the slightest pretence for saying that these notes were to become the property of St. John & Leavens, upon the failure of O'Connel & Brenan to meet their paper at maturity.

St. John, surv. *vs.* O'Connel, surv. for the use, &c.

Such an idea is even excluded by the express terms of the contract, which by the employment of these words, "the above mentioned collateral security" clearly limits the first stipulation we have recited, to the property designated in the contract.

There was no forfeiture of the notes effected by operation of law, upon the failure of O'Connel & Brenan to discharge their paper as it fell due; and St. John & Leavens, if they were under such an impression, certainly did not think of claiming a forfeiture, else why did they render their account to O'Connel & Brenan, and receive the amount of it from their agent? The purposes for which the notes were placed in the hands of St. John & Leavens, having been fully answered by the reimbursement to them of their advances, O'Connel & Brenan had a right *to* demand them.

*Fifth*—There are a variety of acts, which, in point of fact, will amount to a conversion of a personal chattel, though the first taking was lawful. An illegal assumption of ownership—an illegal using or misusing—or a wrongful detention, are all satisfactory *indicia* of a conversion—(1 Chit. Pl. 140, 141.) And a temporary conversion will suffice to render a defendant liable; for a conversion which has once taken place cannot be cured: therefore, if one man take another's horse and ride him, and afterwards return him, yet trover will lie, and the re-delivery will go only in mitigation of damages—(Countess of Rutland's case, 1 Roll's Ab. 5, (e.) pl: So in Wyatt et al. vs. Blades, (3 Camp. R. 395,) Lord Ellenborough decided that a sheriff who had taken the goods of a bankrupt in execution, after a secret act of bankrupt-

cy, and removed them, though he had not sold them, was liable to an action for their conversion without a previous demand. And it has been held, that if a man, against the owner's consent, make use of a thing found or delivered to him, it is a conversion—(Cro. Eliz. 219; 3 B. & A. 687.) In Baldwin vs. Cole, (6 Mod. 212,) Lord Holt determined that the assuming to oneself the property in, and right of disposing of, another man's goods, is in itself a conversion; and this judgment of Lord Holt was approved by the King's Bench, in McCombie vs. Davies, (6 East, 537.)

In what other light can the act of St. John & Leavens be viewed, in placing the notes in dispute beyond their control, than a conversion;—beyond their control, we say, for whatever may have been their intention in suing these notes, or the opinion of their witness of the extent of their powers over the suits, it is clear, that in point of law, the interest in the judgments must be regarded as in J. D. Beers & Co. A Court of Equity might possibly divest this interest, but a Court of Law would consider it paramount. St. John & Leavens, it may be remarked, do not appear, from the proof, to have been partners of J. D. Beers & Co., but that house was merely interested in the business of St. John & Leavens. In this view, it is apparent, that St. John & Leavens have transcended the authority conferred by their contract—have exercised an unauthorised control over the notes in dispute, by placing it beyond their power to return them, when the purposes for which they were pledged were satisfied; and upon the authority we have cited, are chargable with their conversion.

St. John, surv. vs. O'Connel, surv. for the use, &c.

The records from the District court being out of the way, there was no proof of the inability of F. & C. Mc-Lemore, or Curry, Jackson & Co. to pay their notes—but the evidence went rather to show the solvency of both those firms.    Under these circumstances, the measure of the damages was the amount expressed upon the face of the notes, with interest from their maturity up to the *time of their conversion*, and then interest on the aggregate from that time to the verdict—(See Mercer vs. Jones, 3 Campbell's R. 476; Wilson vs. Conine, 2 Johns. R. 280; Shotwell vs. Wendover, 1 Johns. R. 65; Cortelyou vs. Lansing, 2 Caine's cases, 200; Fisher vs. Prince, 3 Burr. 1363; Hunt's adm'r vs. Fuller, 2 Bla. Rep. 902.)— Whether a different rule would apply, or how it should be modified, in cases where the maker of a bill or note which has been converted, is insolvent, is a question involving some important considerations, and we consequently leave it to be decided, when it shall arise in judgment.

*Sixth*—The remaining point embraces the question as to the right of St. John & Leavens to retain the notes placed in their hands, after the purpose for which they had received them was answered, on the ground that O'Connel & Brenan were indebted to them on another account.    The law, on this point, is so clearly stated by Mr. Justice Story, that we will content ourselves with a quotation from that learned author, and a reference to the cases which sustain him—(Story's Bailment, 205.)— He says: "If there are any subsequent accessorial engagements, which either tacitly or expressly, are by the parties intended to be attached to the pledge, the pledgee.

7 P.                        61

has a title and right of possession co-extensive with the new engagements. But the mere existence of a former debt due to the pledgee, does not authorise him to detain the pledge for that debt, when it has been put into his hands for another debt or contract, unless there is some just presumption that such was the intention of the parties. The rule, in such cases, strictly applies, that the contract is to govern the rights of the parties. *Modus et conventio vincunt legem.*"—(See also, 2 Vern. 691; Jarvis vs. Rogers, 15 Mass. R. 389, 397, 414; Green vs. Farmer, 4 Burr. R. 2214; 6 T. R. 258; 7 East's R. 224; 2 Kent's Com. 454; Prec. Ch. 419; Story's Eq. 300; 2 Ves. 372.) In the case at bar, there is no pretence for inferring the assent of O'Connel & Brenan, to the retention of the notes by St. John & Leavens, to secure any other liability but those embraced by the written contract of the parties.

In regard to the expenditures made by St. John & Leavens, in the payment of costs, &c. in endeavoring to collect the notes in controversy, inasmuch as these must have been made in aid of the suits or judgments in favor of J. D. Beers & Co., O'Connel & Brenan are not chargeable with their reimbursement; because the conversion was previously complete.

We think there is no error in the record, and the judgment is therefore affirmed.